**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| SILVERLEAF PRIVATE CREDIT, LLC, | |
| Plaintiff, | CASE NO. CASENUMBER |
| vs. | JUDGE JUDGENAME |
| TURNER ACCEPTANCE CORP.; EVOLUTION FINANCIAL CORP.; CIBC BANK USA; JONATHON LEVIN; RACHEL LEVIN; RACHEL LEVIN PTAC TRUST; and EVOLUTION FINANCIAL CORP., | JURY TRIAL DEMANDED |
| Defendants. | |

## COMPLAINT

Plaintiff, Silverleaf Private Credit, LLC ("*Silverleaf*" or the "*Plaintiff*"), by and through its undersigned counsel, for its Complaint against the above-named defendants, respectfully states as follows:

## NATURE OF THE CASE

This case involves two primary lenders, Defendant CIBC Bank USA and Plaintiff Silverleaf, who both made loans to Defendant Turner Acceptance Corp. that were guaranteed by other defendants, including Evolution Financial Corp., Jonathan Levin, Rachel Levin and the Rachel Levin PTAC Trust. This Complaint is brought by Silverleaf because its rights in the collateral that secures its loan to Turner is already subordinate to CIBC and subject to the terms of an intercreditor agreement between them, but despite CIBC's obligations under that agreement to act in a commercially reasonably manner, it has steadfastly refused to do so and, in process, breached its obligations to Silverleaf and caused others to do the same, causing

Silverleaf to suffer, incur and continue to incur damages in an amount in excess of $75,000 to be proven at trial. In addition to damages, Silverleaf also brings this action to seek the appointment of a receiver, which appointment is warranted not only in light of the substantial and continuing harm that has been done to Silverleaf's collateral, but because Turner and the other Defendants, collectively, refuse to provide any of the information to Silverleaf that they are obligated to provide.

## **PARTIES**

1.      Plaintiff Silverleaf Private Credit, LLC is an Arizona limited liability company with its principal place of business located at 18967 N. 97ᵗʰ Pl., Scottsdale, Arizona 85255. As set forth in paragraph 10, Silverleaf only has two members, both of whom are trusts having their citizenship in California.

2.      Defendant Turner Acceptance Corp. ("*Turner*") is an Illinois corporation with its principal place of business located at 3 Parkway N. Suite 550S, Deerfield, Illinois 60015. Turner's registered agent is CT Corporation System, located at 208 S. LaSalle St., Suite 814, Chicago, Illinois 60604.

3.      Defendant CIBC Bank USA ("*CIBC*") is an Illinois state-chartered bank with its principal place of business located at 120 N. LaSalle St., Chicago, Illinois 60603.  CIBC's address for service of legal process is 120 S. LaSalle St., Chicago, Illinois 60603.

4.      Defendant Evolution Financial Corp. ("*Evolution*") is the parent company of Turner, and is an Illinois corporation with a currently unknown principal place of business. Evolution's registered agent is LSC Registered Agent LLC, located at 120 N. LaSalle St., Fl. 38, Chicago, Illinois 60602.

5.      Defendant Jonathon Levin ("*Jonathon*") is an individual and principal of Turner and Evolution.  Upon information and belief, Jonathon is a citizen of the state of Illinois.

6.     Defendant Rachel Levin ("*Rachel*") is the spouse of Jonathon and a beneficiary of the Trust (defined below).  Upon information and belief, Rachel is a citizen of the state of Illinois.

7.     Defendant Rachel Levin PTAC Trust ("*Trust*") is a shareholder of Evolution. Upon information and belief, Trust was formed under the laws of the state of Illinois. Upon information and belief, Robert M. Levin is the Trustee of the Trust and is a citizen of Illinois.

## JURISDICTION AND VENUE

8.     Jurisdiction over this action is based upon diversity of citizenship under 28 U.S.C. § 1332(a)(1).

9.     The amounts in controversy in this action exceed $75,000.

10.    Complete diversity of citizenship among the Plaintiff and the Defendants exists:

    a.  Plaintiff, an Arizona limited liability company, has two (2) members:  The Copenhagen Trust and The Above All Dynasty Trust.  The Trustees of The Copenhagen Trust are Dean Morrow and Joshua Lindsey, each of whom are citizens of the State of California.  The Trustees of The Above All Dynasty Trust are Joshua Lindsey and Solomon Yaqoot, both of whom are citizens of the State of California.

    b.  None of the Defendants are incorporated in or citizens of Arizona or California.  CIBC is chartered in Illinois.  Evolution, Jonathon, Rachel, and Trust are either incorporated in Illinois, formed under the laws of the State of Illinois, and/or are citizens of Illinois. On information and belief, the Trust's lone trustee is also a citizen of Illinois.

11.    This Court has supplemental jurisdiction over all state law claims under 28 U.S.C. § 1367(a).

12.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(1), in that all Defendants are residents of Illinois and reside within this judicial district, and under 28 U.S.C. § 1391(b)(2) in that a substantial part of the events giving rise to this action occurred in this district.

## BACKGROUND FACTS

### A.     The Loan Documents

13.     Silverleaf and Turner are parties to a Term Credit Agreement dated as of September 2, 2022, a true and correct copy of which is attached hereto as *Exhibit A* and incorporated herein by reference (the "*Credit Agreement*").

14.     Pursuant to the Credit Agreement, Silverleaf, as lender, made loans and other financial accommodations ("*Loans*") to Turner, as borrower.

15.     In connection with the Credit Agreement, Turner executed and delivered to Silverleaf that certain Term Note dated September 2, 2022 in the original principal amount of $5,000,000 (the "*Term Note*").  A true and correct copy of the Term Note is attached hereto as *Exhibit B* and incorporated herein by reference.

16.     Other agreements delivered to Silverleaf in connection with the Credit Agreement include:  (a) the Guaranty and Collateral Agreement, dated as of September 2, 2022, pursuant to which, *inter alia*, Turner and its parent, Defendant Evolution Financial Corp. ("*Evolution*") granted to Silverleaf security interests in certain Collateral, consisting of all current and future personal property of Turner and Evolution, and pursuant to which Evolution guaranteed the prompt and complete payment and performance of Turner's obligations under the Loan Documents;[1] (b) that certain Guaranty dated September 2, 2022, made by Jonathon Levin and

---

[1] A true and correct copy of the Guaranty and Collateral Agreement is attached hereto as *Exhibit C* and incorporated herein by reference.

Rachel Levin in favor of Silverleaf (the "*Levin Guaranty*");[2] (c) that certain Pledge Agreement dated July 1, 2024 by Robert M. Levin, not individually but in his capacity as Trustee of the Rachel Levin PTAC Trust dated July 1, 2024 (the "*Rachel Levin Pledge Agreement*"), pursuant to which the pledgor pledged to Silverleaf as security its shares of Evolution;[3] (d) that certain Pledge Agreement dated September 2, 2022 by Jonathon Levin in favor of Silverleaf (the "*Jonathon Levin Pledge Agreement*"), pursuant to which the pledgor pledged to Silverleaf as security his shares of Evolution;[4] and (e) that certain Pledge Agreement dated September 2, 2022 by Evolution (the "*Evolution Pledge Agreement*"), pursuant to which the pledgor pledged to Silverleaf as security its shares of Turner.[5]

17.     The Credit Agreement, Term Note, Guaranty and Collateral Agreement, Levin Guaranty, Rachel Levin Pledge Agreement, Jonathon Levin Pledge Agreement, Evolution Pledge Agreement, and any other documents executed or delivered in connection with the Loans are collectively defined herein as the "*Loan Documents*."

18.     At the time the Loans were made, and continuing to this date, Turner also had loans outstanding with a bank group led by Defendant CIBC Bank USA ("*CIBC*"), as administrative agent, which loans are evidenced by certain loan and security agreements, notes, and guaranties (collectively, the "*CIBC Loan Documents*").

---

[2] A true and correct copy of the Levin Guaranty is attached hereto as *Exhibit D* and incorporated herein by reference.

[3] A true and correct copy of the Rachel Levin Pledge Agreement is attached hereto as *Exhibit E* and incorporated herein by reference.

[4] A true and correct copy of the Jonathon Levin Pledge Agreement is attached hereto as *Exhibit F* and incorporated herein by reference.

[5] A true and correct copy of the Evolution Pledge Agreement is attached hereto as *Exhibit G* and incorporated herein by reference.

19.     At the time the Loans were made, Silverleaf was required to execute that certain Subordination and Intercreditor Agreement (the "*Intercreditor Agreement*"), dated as of September 2, 2022, by and among Silverleaf, CIBC, Turner, and Evolution.  A true and correct copy of the Intercreditor Agreement is attached hereto as *Exhibit H* and incorporated herein by reference.

20.     Pursuant to the Intercreditor Agreement, CIBC undertook certain obligations in consideration of Silverleaf's agreement to subordinate its claims and liens to CIBC.  Chief among those obligations, at least as it relates to the causes of action raised in this Complaint, is the obligation to conduct any foreclosure of its liens on the Collateral in a commercially reasonable manner, which is consistent with CIBC's general obligations as a secured creditor under Illinois law.  Ex. H, § 4.3; 810 ILCS 5/9-610.  Moreover, the Intercreditor Agreement leaves undisturbed certain of Silverleaf's rights as it relates to Turner, including the right to impose default interest in the event of a default by Turner, and actions to compel the specific performance of covenants in the Credit Agreement.  Ex. H, Definition of "Enforcement Action."

21.     The Intercreditor Agreement provides that Silverleaf subordinated and made junior all liens on the Collateral to (a) the liens of the Bank Group on the Collateral; (b) all guaranties and supporting obligations created pursuant to the CIBC Loan Documents; and (c) all of the terms, covenants, conditions, rights and remedies contained in the CIBC Loan Documents with respect to the Collateral.

22.     The Intercreditor Agreement also provides that Silverleaf's ability to enforce its rights and remedies under the Loan Documents are constrained or prohibited in certain respects, and that Silverleaf is prohibited from taking certain actions to impede, interfere, or restrict or

restrain the exercise by members of the Bank Group of rights and remedies under the CIBC Loan Documents.

23.     Specifically, Section 4.2 of the Intercreditor Agreement, which purports to block Silverleaf from taking "any Enforcement Action **against any of the Collateral** (a) during a Payment Blockage Period and (b) during any time when a Payment Blockage Period is not then in effect, at any time unless it has given the Bank Group Agent not less than twenty (20) business' days prior written notice of such Enforcement Action." (emphasis added).

24.     Section 4.2 of the Intercreditor Agreement does not preclude Silverleaf from seeking the appointment of a Receiver.

25.     Section 4.2 of the Intercreditor Agreement does not act as a bar to *all* Enforcement Actions, but rather, only those taken "against any of the Collateral."

26.     Silverleaf requesting the appointment of a Receiver is not an action taken against the Collateral.

27.     The defined term "Enforcement Action" does not expressly capture a motion for appointment of a receiver.  In relevant part, the Intercreditor Agreement defines "Enforcement Action" as:

> Any enforcement by any Secured Lender of any right or remedy including any enforcement or foreclosure of Liens securing any of its Secured Indebtedness or any other efforts to collect Proceeds from the Borrower's or any Guarantor's assets or properties to satisfy its Secured Indebtedness . . .

Ex. H, pg. 3.

28.     At the time Silverleaf was negotiating the Intercreditor Agreement with CIBC, it was provided with a copy of the Amended and Restated Credit Agreement dated as of November 12, 2020 between Turner, CIBC as Administrative Agent and Lead Arranger, and the other Lenders thereto (the "*CIBC Credit Agreement*," a copy of which is attached hereto as *Exhibit I*).

29.     The CIBC Credit Agreement makes reference to a "Backup Servicing Agreement" between Turner, CIBC, and a "Backup Servicer," but no copy of such an agreement was provided to Silverleaf, whether in draft or executed form, before execution of the Intercreditor Agreement.  Silverleaf would not have entered into the Intercreditor Agreement without seeing a copy of the Backup Servicer Agreement and approving it at the time it signed the Intercreditor Agreement.  Without a draft of the intended Backup Servicer Agreement attached or provided as part of the transaction, no Backup Servicer Agreement could be executed without Silverleaf's approval.

30.     As a general matter, backup servicing agreements are almost never used in the niche subprime lending space, given the substantial risks to a portfolio's collectability when servicing is transferred to a third-party.  The CIBC Credit Agreement's description of the Backup Servicing Agreement as limited only to "backup servicing and verification services" led Silverleaf to believe that no Backup Servicer would have expansive servicing powers or right to become a successor servicer, nor that CIBC would be able to force a transition to a third-party servicer for any conceivable reason.

31.     In fact, a Backup Servicing Agreement was not entered into between Turner, CIBC, and Center Street Finance, LP ("*Center Street*") until August 1, 2022 – just one month prior to Silverleaf making its Loans to Turner, and over 18 months after the CIBC Credit Agreement required it to be entered into (the "*Center Street Backup Agreement*," a copy of which is attached hereto as *Exhibit J*.  The Center Street Backup Agreement goes *far* beyond the limited scope contemplated by the CIBC Credit Agreement, and in fact allows CIBC to appoint Center Street as a successor servicer *at its sole option*, *at any time*, and *for any reason*.  Ex. J, § 2(a).  And the services contemplated to be provided by Center Street thereunder are

unquestionably broad – in effect, Center Street would completely take over the servicing function for Turner's portfolio, requiring Turner to provide unfettered access and turnover of all of its financial systems and data to Center Street to facilitate the servicing transition. Ex. J, § 3 & Ex. A.

32.     Moreover, concurrently with the Center Street Backup Agreement, a Successor Servicing Agreement was also entered into between Turner, CIBC, and Center Street. *Exhibit K*. This Successor Servicing Agreement similarly can be invoked for seemingly any reason, and in fact goes further than the Center Street Backup Agreement in that it actually designates Center Street as a successor servicer (suggesting that it would be a complete replacement for Turner). Notably, *there was no reference in the CIBC Credit Agreement to a Successor Servicing Agreement*, and CIBC did not make it known to Silverleaf at any time that such an agreement had been or would be entered into.

33.     There is a good reason why CIBC concealed the true nature of the (suspiciously delayed) backup and successor servicing arrangements from Silverleaf: had Silverleaf known that Turner's servicing of its loan portfolio could be wrested from it for any reason whatsoever and handed off to a third party – *even in the absence of a default or other extraordinary circumstances (like fraud or theft)* – it would have immediately backed away from Turner. There is no possibility that Silverleaf would have willingly entered into a subordinated $5 million loan transaction under those circumstances.

**B.     Turner's Liquidation – and CIBC's Actions – Diminish the Value of Silverleaf's Collateral**

34.     Silverleaf filed this action as a direct result of Turner and CIBC violating their obligations under the Loan Documents, the Intercreditor Agreement and Illinois law and, in so

doing, causing Silverleaf to suffer ongoing and continuing damages that are likely irreparable due to its position as a junior secured creditor of Turner.

35.     Founded in 1973, Turner was previously in the consumer finance business, specializing in both direct and indirect lending.  Its direct lending business involved the provision of personal loans and financing, primarily to Illinois consumers, and predominantly in the automotive space, and its indirect lending channel provided personalized service to auto dealers and merchants.  As part of its business, Turner owns a portfolio of performing and non-performing retail automobile installment contracts and consumer loans.  The loans are secured by the automobiles and trucks purchased by the consumer borrowers.

36.     The Intercreditor Agreement obligates CIBC to act in a commercially reasonable manner in conducting and enforcing collateral lien foreclosures.  Section 4.3 of the Intercreditor Agreement specifically provides: "In foreclosing their Liens on the Collateral, so long as the Bank Group Creditors proceed in a commercially reasonable manner, the Bank Group Creditors may proceed to foreclose on their Liens on the Collateral in any manner which they choose, even though a higher price might have been realized if they had proceeded to foreclosure on their Liens in another manner." Ex. H, § 4.3.

37.     The Intercreditor Agreement is governed by Illinois law. (See, Intercreditor Agreement § 6.14.) Illinois law likewise provides that: (a) after default, the secured party may dispose of "any or all of the collateral in its present condition or following any commercially reasonable preparation or processing" (801 ILCS 5/9-610(a)); and, "[e]very aspect of a disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable" (801 ILCS 5/9-610(b)).

38.     CIBC notified Turner of defaults under the CIBC Loan Documents by correspondence dated February 6, 2023, after which Turner ceased funding loan obligations in connection with its business, and began a process of managed self-liquidation.   This thereby triggered CIBC's obligation, both pursuant to the Intercreditor Agreement and under Illinois law, to act in a commercially reasonable manner in the process of such liquidation.

39.     CIBC failed to meet this obligation in several respects, thereby constituting a breach of the Intercreditor Agreement, as discussed below:

a)      First, in May 2023, CIBC restricted Turner's ability to allow its consumer borrowers to modify their loans, which is highly unreasonable in the industry, when creditors are seeking to assist their debtors' ability to repay.   Indeed, it is well known among industry experts, including Silverleaf, that when borrowers are denied reasonable requests for loan modifications, such borrowers will often simply stop making payments; indeed, their inability to meet their payment obligations was the very reason for the modification requests.   The result of the restrictions placed by CIBC was an immediate and significant spike in delinquencies in Turner's consumer loan portfolio.

b)      Second, in or about April 2023, CIBC also rejected a proposed refinancing transaction which would have cured Turner's over-advance on the Bank Group loans, and would have provided an immediate positive result for all Turner creditors, including Silverleaf.   This refinancing transaction would have resulted in $2 million of much needed capital, and notably, the refinancing would have come in *junior* to CIBC on eligible receivables

11

and therefore would have had no negative impact on its collateral position. Silverleaf was not consulted regarding this refinancing transaction; the decision to reject it was unilaterally made by CIBC. And while after the fact, CIBC provided Turner with certain justifications for rejecting the refinancing transaction, those justifications were largely unavailing and would have been entirely rebutted by Silverleaf (had it been given the opportunity to do so), which, unlike CIBC, has extensive experience in the subprime automotive lending space.

40. After CIBC declared a default under the CIBC Loan Documents, Silverleaf and CIBC discussed CIBC's potential options regarding Turner's liquidation of its portfolio. In addition, Turner (upon information and belief, at the insistence of CIBC) retained High Ridge Partners ("*High Ridge*"), a reputable turnaround advisory and consulting firm based in Chicago, to provide analyses of several different liquidation scenarios, including (i) a Turner-managed self-liquidation with an appointed Chief Restructuring Officer; (ii) an organic runoff of Turner's portfolio managed by Nationwide Acceptance (a competing sub-prime automotive lender and servicer); (iii) an organic runoff of Turner's portfolio managed by Center Street (which would involve a transfer of servicing to a third party); and (iv) a bulk sale of the portfolio. A true and correct copy of High Ridge's liquidation analysis is attached hereto and incorporated herein as *Exhibit L*.

41. High Ridge concluded in its liquidation analysis that the Turner-managed self-liquidation option provided *by far* the best overall outcome for all stakeholders, resulting in payment in full of both the Bank Group loans and the Silverleaf Loans, as well as indebtedness owing to junior creditors and a partial return to Turner's shareholders.

12

42.     Each of the other options provided for progressively worse outcomes for Turner's stakeholders.

43.     High Ridge determined that if servicing of the portfolio was transferred to a third party servicer, CIBC would be paid in full, but Silverleaf was likely to suffer an impairment of its collateral, and junior creditors and shareholders would end up "out of the money."

44.     Silverleaf also knew, based on its substantial operating experience and expertise, that in addition to the Bank Group disallowing customer loan modifications, any transfer of servicing from Turner to a third-party servicer would further result in additional substantial payment flow disruption and significant additional and unreasonable loss rates.

45.     The downside risk of the procedural modifications and changes imposed by the Bank Group is substantial in the niche-specific lending space in which Turner operated, and of which CIBC should have been aware.

46.     Silverleaf put CIBC and Turner on notice, in writing, of the substantial downside risk associated with any transfer of servicing rights of the Turner loan portfolio.  Specifically, in July 2023, Silverleaf gave CIBC written notice that "the senior lenders' retention of a 3rd party servicer would be commercially unreasonable," in a letter noting Silverleaf's own substantial operating experience, including the effect of minor changes in customer payment platforms causing 30+ day delinquencies to spike from 7% to 13.5% (a 93% increase).  A true and correct copy of the Silverleaf correspondence to CIBC dated July 5, 2023 is attached hereto and incorporated herein as *Exhibit M*.  It was only after Silverleaf gave CIBC notice of the commercial unreasonableness of such servicing transfer that any party gave Silverleaf a copy of the previously unknown Backup Servicing Agreement.  At that time, Turner sent the Backup Servicing Agreement, as well as another previously unknown agreement, the Successor Servicer

Agreement, and an entirely separate additional Successor Servicing Agreement executed with another entity, Niko.

47.     Because of the significant downside risk to portfolio performance and related losses if the above measures were taken, Silverleaf doubted full recovery on its Loans would be possible if CIBC persisted with the above approach.

48.     Silverleaf reiterated its position that a transfer to third-party servicers would be commercially unreasonable in a letter dated January 11, 2024, from Silverleaf to the newly-retained third party servicers, which was copied to CIBC.  A true and correct copy of the Silverleaf correspondence to Westlake Portfolio Management and Westlake Capital Finance, and Center Street Finance, copying CIBC dated January 11, 2024 is attached hereto and incorporated herein as *Exhibit N*.

49.     However, Silverleaf's warnings, based upon extensive relevant industry experience, were completely ignored by CIBC.

50.     On or about February 5, 2024, CIBC directed the transfer of servicing of Turner's loan portfolio from Turner's self-managed program to Westlake Portfolio Management.

51.     Turner – through its principal Jonathon – expressed to Silverleaf that it did not support the transfer of its servicing to a third party, and further, Jonathon repeatedly stated to Silverleaf that he was concerned that CIBC would seek to enforce a personal guaranty that Jonathon made to it.  Ultimately, however, Turner agreed to the transfer.  Notably, as of the date of this Complaint, CIBC has not filed a civil action against Jonathon to enforce its guaranty.

52.     CIBC's blocking of loan modifications, coupled with the transfer of servicing of Turner's loan portfolio, resulted in a profound increase in delinquencies, and catastrophic portfolio losses, exactly as predicted by Silverleaf as well as High Ridge.

53.     For calendar year 2022 (the last full year before CIBC began interfering with Turner's business), 31+ day delinquencies averaged 8.12%.  For calendar year 2023, 31+ day delinquencies increased **by almost 80%**, to 14.48%, reaching almost 20% by December 2023.

54.     And while Silverleaf has not been provided with complete information concerning 2024 and 2025 results, the information it has received suggests further increases in the delinquency rate.

55.     As a result of the dramatic rise in delinquencies, Turner's ability to satisfy its indebtedness to Silverleaf has been placed in substantial doubt.

56.     Indeed, Silverleaf has estimated that it may not recover *anything* on its substantial loans to Turner, and even that CIBC's ability to fully recover may be impacted.

57.     Making matters worse is that CIBC and Turner have been completely uncooperative in addressing Silverleaf's valid concerns with how Turner's wind-down and liquidation have been managed.

58.     Reasonable requests for information concerning collections, delinquencies, bank loan balances, and other relevant metrics – whether those requests were directed to Turner, CIBC, or the successor servicer – either go unresponded to or are outright rejected.

59.     Moreover, CIBC has taken an increasingly aggressive posture with Silverleaf, misconstruing the valid (and prescient) concerns raised by Silverleaf as "harassment" and threatening legal action based on an alleged breach of the Intercreditor Agreement.  *See, e.g.*, March 7, 2025 correspondence from CIBC to Silverleaf, a true and correct copy of which is attached hereto and incorporated herein as *Exhibit O*.

60.     In light of CIBC's commercially unreasonable conduct and its complete refusal to cooperate in good faith with Silverleaf's reasonable requests for information necessary for it to

estimate its collateral position and the collectability of its Loans, Silverleaf attempted to take action to force accountability on the part of CIBC and Turner.

61.     Specifically, on February 27, 2025, Silverleaf filed an involuntary petition (Case No. 25-02938, the "*Involuntary Bankruptcy*") against Turner pursuant to chapter 7 of the United States Bankruptcy Code on February 27, 2025 in the U.S. Bankruptcy Court for the Northern District of Illinois (the "*Bankruptcy Court*"), in hopes of having a trustee appointed to undertake substantially similar duties to those that the proposed Receiver would possess here.

62.     Recently, the Bankruptcy Court dismissed the Involuntary Bankruptcy, in response to a motion to dismiss filed by Turner, which alleged that the Involuntary Bankruptcy could not proceed due to lack of impacted creditors, among other things (Case No. 25-02938 (Bankr. N.D. Ill.), Docket No. 26).

63.     While Silverleaf can pursue – and is pursuing – claims against CIBC in this civil action for the damage it has caused, the only remaining available remedy to preserve and protect Silverleaf's collateral is through the appointment of a Receiver, which is requested herein and in its Emergency Motion for Appointment of a Receiver that will be filed subsequently.

**C.     Turner's Defaults Under The Credit Agreement and Term Note**

64.     The Term Note requires that Turner make payments of principal and interest to Silverleaf on the dates set forth in the Credit Agreement.

65.     Section 4.2 of the Credit Agreement provides that accrued interest shall be payable in arrears on the last day of each calendar month and at maturity.

66.     Section 6.1 of the Credit Agreement provides that after the first two years of the term of the Loan (during which it was interest-only), beginning on October 1, 2024, Turner shall make principal payments in the amount of $138,888.88 on the first day of each month for the remaining term of the Term Note.

16

67.    Since February 2023, Turner has failed to make interest payments to Silverleaf, and has never made a required payment of principal to Silverleaf.  Accordingly, on March 3, 2023, Silverleaf provided formal written notice of default to Turner based on its payment defaults.  *Exhibit P*.

68.    Accordingly, pursuant to section 13.1 of the Credit Agreement, an Event of Default has occurred and is continuing, giving rise to the exercise of available default rights and remedies under section 13.2 of the Credit Agreement, subject to the Intercreditor Agreement (to the extent the Intercreditor Agreement remains enforceable).

69.    As of the date of this Complaint, Turner is indebted to Silverleaf in an amount not less than $7,017,083.33, consisting of $5,000,000 of unpaid principal, and $2,017,083.33 of accrued and unpaid interest, plus Silverleaf's attorneys' fees and costs incurred to date (estimated to be in excess of $100,000.00).

70.    Other Events of Default have occurred and are continuing under the Credit Agreement as well, including, but not limited to:

     a)    the occurrence of events of default under the CIBC Loan Documents (section 13.1.2);

     b)    Turner's general inability to pay its debts as they become due (section 13.1.4); and

     c)    Turner's failure to comply with certain covenants as set forth in section 10 of the Credit Agreement, including the failure to provide certain required financial reports, financial and budget projections, as well as the failure to maintain its property (through its improvident transfer of servicing of its portfolio).

17

Each of these Events of Default also give rise to the exercise of default remedies under section 13.2 of the Credit Agreement.

71.     The precipitating breach of the Intercreditor Agreement by CIBC frees Silverleaf from any restraints in the Intercreditor Agreement that CIBC might otherwise argue purport to prohibit this action by Silverleaf.  As such, Silverleaf is not prohibited under the Intercreditor Agreement from bringing this action.

**D.     Evolution's Obligations Under the Guaranty and Collateral Agreement**

72.     Under the Guaranty and Collateral Agreement, Evolution guaranteed the full and prompt payment and performance of all Company [Turner] Obligations.

73.     The Guaranty and Collateral Agreement expressly provides as follows:

> Each of the Guarantors hereby, jointly and severally, unconditionally and irrevocably, as a primary obligor and not only a surety, guarantees to Lender and its successors, indorsees, transferees and assigns, the prompt and complete payment and performance by the Company [Turner] when due (whether at the stated maturity, by acceleration or otherwise) of the Company Obligations.

*See* Ex. C, § 2.1(a).

74.     "Grantor" means all signatories to the Guaranty and Collateral Agreement.  *See* Ex. C, at 1.

75.     Evolution is a signatory to the Guaranty and Collateral Agreement.  *See* signature page to Ex. C.

76.     Based upon Turner's defaults under the Term Note as described above, including but not limited to its failure to make required interest and principal payments, Evolution is obligated immediately to repay the full amount owed by Turner under the Term Note.

77.     Further, Evolution's failure to perform Turner's obligations under the Credit Agreement, including the provision of annual and interim reports, certificates, and other

information required under section 10.1, constitutes an additional breach of the Guaranty and Collateral Agreement.

78.     In addition, under the Guaranty and Collateral Agreement, Evolution granted to Silverleaf a security interest in Evolution's assets as more fully described in the Guaranty and Collateral Agreement.

79.     The Guaranty and Collateral Agreement expressly provides as follows:

> Each Grantor [which includes Evolution] hereby assigns and transfers to Lender [Silverleaf], and hereby grants to Lender and (to the extent provided herein) its Affiliates, a continuing security interest in all of its Collateral, as collateral security for the prompt and complete payment and performance when due (whether at the stated maturity, by acceleration or otherwise) of the Company Obligations or the Guarantor Obligations, as the case may be.

*See* Ex. C, § 3.

80.     "Company Obligations" means all obligations of Turner.  *See* Ex. C, § 1.2.

81.     Based upon Turner's defaults under the Term Note as described above, Silverleaf is entitled to take such action as permitted under applicable law to foreclose on the Collateral granted to it by Evolution under the Guaranty and Collateral Agreement.

**E.     Jonathon's and Rachel's Obligations Under The Levin Guaranty**

82.     Under the Levin Guaranty, Jonathon and Rachel each jointly and severally guaranteed the full and prompt payment of all amounts due under the Term Note, as well as the prompt performance of certain obligations thereunder.

83.     The Levin Guaranty expressly provides as follows:

> The Guarantors [Jonathon and Rachel] hereby, jointly and severally, irrevocably, unconditionally and absolutely, guarantee to Lender [Silverleaf] the due and prompt payment, and not just the collectability, of all amounts and the due and prompt performance by Borrower [Turner] of all obligations for which Borrower has recourse liability to Lender under the terms of the [Term] Note . . .

*See* Ex. D, ¶ 1.

84. Based upon Turner's defaults under the Term Note as described above, each of Jonathon and Rachel, jointly and severally, is obligated immediately to repay the full amount owed by Turner under the Term Note.

**F. Rachel's Obligations Under The Rachel Levin Pledge Agreement**

85. Under the Rachel Levin Pledge Agreement, the Trust pledged to Silverleaf as collateral for Turner's obligations under the Term Note all of its equity in Evolution, together with all distribution and associated rights in connection with such equity interest, as more fully described in the Rachel Levin Pledge Agreement. *See* Ex. E, ¶ 1.

86. "Events of Default" under the Rachel Levin Pledge Agreement has the meaning assigned in the Credit Agreement. *See* Ex. E, § 5.

87. Upon the occurrence of an Event of Default, Silverleaf is entitled under the Rachel Levin Pledge Agreement to take certain actions as its rights and remedies, including, among others, becoming "entitled to notify the Pledged Issuer of the Pledged Equity to make payment to Lender and to receive all Distributions to be applied toward the satisfaction of the Obligations and to exercise all voting, conversion, exchange, subscription or other corporate rights, privileges or options pertaining to the Pledged Equity[]" and having "the right, at its discretion, to transfer to or register in the name of Lender or any nominee of Lender any of the Collateral." *See* Ex. E, § 6.

88. Based upon Turner's defaults under the Term Note as described above, Silverleaf is entitled to take the actions described in Section 6 of the Rachel Levin Pledge Agreement and such action as permitted under applicable law to foreclose on the Collateral granted to it by the Trust under the Rachel Levin Pledge Agreement.

**G.** **Jonathon's Obligations Under The Jonathon Levin Pledge Agreement**

89.     Under the Jonathon Levin Pledge Agreement, Jonathon pledged to Silverleaf as collateral for Turner's obligations under the Term Note all of his equity in Evolution, together with all distribution and associated rights in connection with such equity interest, as more fully described in the Jonathon Levin Pledge Agreement.  *See* Ex. F, ¶ 1.

90.     "Events of Default" under the Jonathon Levin Pledge Agreement has the meaning assigned in the Credit Agreement.  *See* Ex. F, § 5.

91.     Upon the occurrence of an Event of Default, Silverleaf is entitled under the Jonathon Levin Pledge Agreement to exercise its rights and remedies, including, among others, becoming "entitled to notify the Pledged Issuer of the Pledged Equity to make payment to Lender and to receive all Distributions to be applied toward the satisfaction of the Obligations and to exercise all voting, conversion, exchange, subscription or other corporate rights, privileges or options pertaining to the Pledged Equity[]" and having "the right, at its discretion, to transfer to or register in the name of Lender or any nominee of Lender any of the Collateral."  *See* Ex. F, § 6.

92.     Based upon Turner's defaults under the Term Note as described above, Silverleaf is entitled to take the actions described in Section 6 of the Jonathon Levin Pledge Agreement and such action as permitted under applicable law to foreclose on the Collateral granted to it by Jonathon under the Jonathon Levin Pledge Agreement.

**H.** **Evolution's Obligations Under The Evolution Pledge Agreement**

93.     Under the Evolution Pledge Agreement, Evolution pledged to Silverleaf as collateral for Turner's obligations under the Term Note all of its equity in Turner, together with all distribution and associated rights in connection with such equity interest, as more fully described in the Evolution Pledge Agreement.  *See* Ex. G, ¶ 1.

94.    "Events of Default" under the Evolution Pledge Agreement has the meaning assigned in the Credit Agreement. *See* Ex. G, § 5.

95.    Upon the occurrence of an Event of Default, Silverleaf is entitled under the Evolution Pledge Agreement to exercise its rights and remedies, including, among others, becoming "entitled to notify the Pledged Issuer of the Pledged Equity to make payment to Lender and to receive all Distributions to be applied toward the satisfaction of the Obligations and to exercise all voting, conversion, exchange, subscription or other corporate rights, privileges or options pertaining to the Pledged Equity[]" and having "the right, at its discretion, to transfer to or register in the name of Lender or any nominee of Lender any of the Collateral." *See* Ex. G, § 6.

96.    Based upon Turner's defaults under the Term Note as described above, Silverleaf is entitled to take the actions described in Section 6 of the Evolution Pledge Agreement and such action as permitted under applicable law to foreclose on the Collateral granted to it by Evolution under the Evolution Pledge Agreement.

## COUNT I
## Breach of Contract (Credit Agreement)
## <u>Against Turner</u>

97.    Silverleaf repeats and realleges the allegations contained in paragraphs 1 through 96 of the Complaint as if fully set forth herein.

98.    Silverleaf and Turner are parties to the Credit Agreement.

99.    The Credit Agreement is a valid, binding, and enforceable contract between Silverleaf and Turner.

100.    Silverleaf has performed all obligations and covenants on its part to be performed pursuant to the Credit Agreement.

101.    Events of Default have occurred and are continuing under the Credit Agreement, including that since March 3, 2023, Turner has failed to make interest payments to Silverleaf, and has never made a required payment of principal to Silverleaf.

102.    As a result of the Events of Default, Turner breached the Credit Agreement.

103.    Upon occurrence of the Events of Default, Silverleaf became entitled to assert its default rights and remedies in the Credit Agreement (subject to the Intercreditor Agreement, to the extent enforceable against Silverleaf).

104.    As a direct and proximate result of Turner's breach of the Credit Agreement, as of the date of this Complaint, Silverleaf is entitled to a money judgment in an amount not less than $7,017,083.33, consisting of $5,000,000 of unpaid principal and $2,017,083.33 of accrued and unpaid interest, plus additional accrued interest and Silverleaf's attorneys' fees and costs in an amount to be determined at trial.

**WHEREFORE,** Silverleaf respectfully requests that this Court enter judgment in its favor and against Turner:

      a)    awarding to Silverleaf an amount not less than $7,017,083.33, consisting of $5,000,000 of unpaid principal and $2,017,083.33 of accrued and unpaid interest, plus additional accrued interest and Silverleaf's attorneys' fees and costs in an amount to be determined at trial;

      b)    such additional amounts allowable under the Credit Agreement as they accrue; and

      c)    granting such other and further relief in favor of Silverleaf as this Court deems fair and equitable.

## COUNT II
## Specific Performance
## <u>Against Turner</u>

105.    Silverleaf repeats and realleges the allegations contained in paragraphs 1 through 96 of the Complaint as if fully set forth herein.

106.    The Credit Agreement is a valid, binding, and enforceable contract.

107.    Article 10 of the Credit Agreement states that until all Obligations under the Loan Documents are paid in full, Turner is required to furnish certain financial reports, certificates, and other information to Silverleaf, including, but not limited to:   (i) annual audit reports, including consolidated balance sheets, statements of earnings, and cash flows; (ii) a consolidated balance sheet of Turner and its subsidiaries for each fiscal year; (iii) monthly financial reports; (iv) compliance certificates; (v) copies of all reports filed with the Securities and Exchange Commission; (vi) borrowing base certificates; (vii) all financial and management reports submitted to Turner by independent auditors; (viii) annual financial projections certified by a senior officer of Turner; (ix) copies of any notices received from CIBC; (x) all accounts receivable aging reports, allowance roll-forward schedules for the "Finance Accounts," summary roll-forward schedules of discount activity for the Finance Accounts, modified Finance Accounts reports, cash reconciliation reports for all Finance Accounts, and exception and post-modification performance reports for all Finance Accounts, concurrently with their delivery to CIBC; and (xi) such other information and reports concerning Turner, its properties or business, as Silverleaf may reasonably request.

108.    As of the date of this Complaint, the Obligations under the Loan Documents have not been paid in full; accordingly, Turner remains obligated to provide each of the reports and certificates set forth in Article 10 of the Credit Agreement to Silverleaf.

109.    Turner has repeatedly failed to provide timely and complete financial reports to Silverleaf, despite repeated requests of Silverleaf.

110.    In the absence of such reports, Silverleaf lacks information sufficient to evaluate Turner's business, including the performance of its loan portfolio, and therefore, the value of its collateral and the likelihood of recovery from the proceeds of the liquidation of the collateral.

WHEREFORE, Silverleaf respectfully requests that this Court enter judgment in its favor and against Turner:

a)    ordering Turner to provide to Silverleaf all financial reports, information, and certificates required to be provided to Silverleaf under the Credit Agreement, including all reports concerning Turner's loan portfolio; and

b)    granting such other and further relief in favor of Silverleaf as this Court deems fair and equitable.

## COUNT III
### Breach of Contract (Intercreditor Agreement)
### Against CIBC

111.    Silverleaf repeats and realleges the allegations contained in paragraphs 1 through 96 of the Complaint as if fully set forth herein.

112.    Silverleaf and CIBC are parties to the Intercreditor Agreement.

113.    The Intercreditor Agreement was a valid, binding, and enforceable contract between Silverleaf and CIBC.

114.    Silverleaf has performed all obligations and covenants on its part to be performed pursuant to the Intercreditor Agreement.

115.    CIBC breached the Intercreditor Agreement by failing to perform its obligations thereunder, including, but not limited to:

a)      The breaches set forth in paragraph 39 of this Complaint; and

b)      Electing to utilize a third-party servicer to run Turner's liquidation rather than conducting a self-managed liquidation, notwithstanding (i) the High Ridge liquidation analysis showing that transferring servicing to a third party would result in dramatically reduced, if not completely eliminated, recoveries to junior creditors – and the potential for a catastrophic and total impairment of Silverleaf's collateral and (ii) clear and repeated warnings of the same from Silverleaf based upon its expertise and significant experience in the subprime lending space.

116.      As a result, CIBC breached the Intercreditor Agreement.

117.      As a direct and proximate result of CIBC's breach of the Intercreditor Agreement, as of the date of this Complaint, Silverleaf is entitled to a money judgment in an amount not less any deficiency balance remaining on the Loan after the liquidation of its Collateral, and attorneys' fees and costs, in an amount to be determined at trial.

**WHEREFORE,** Silverleaf respectfully requests that this Court enter judgment in its favor and against CIBC:

a)      awarding to Silverleaf an amount not less any deficiency balance remaining on the Loan after the liquidation of its Collateral, plus Silverleaf's attorneys' fees and costs in an amount to be determined at trial;

b)      such additional amounts allowable under the Intercreditor Agreement as they accrue; and

c) granting such other and further relief in favor of Silverleaf as this Court deems fair and equitable.

**COUNT IV**
**Breach of the Implied Covenant of Good Faith and Fair Dealing**
**Against CIBC**

118. Silverleaf repeats and realleges the allegations contained in paragraphs 1 through 96 of the Complaint as if fully set forth herein.

119. Silverleaf and CIBC are parties to the Intercreditor Agreement.

120. The Intercreditor Agreement was a valid, binding, and enforceable contract between Silverleaf and CIBC.

121. Silverleaf has performed all obligations and covenants on its part to be performed pursuant to the Intercreditor Agreement.

122. Under Illinois law, an implied covenant of good faith and fair dealing exists with respect to each and every contract to be performed in Illinois.

123. CIBC breached the implied covenant of good faith and fair dealing by, among other things:

a) The breaches set forth in paragraph 39 of this Complaint;

b) Electing to utilize a third-party servicer to run Turner's liquidation rather than conducting a self-managed liquidation, notwithstanding (i) the High Ridge liquidation analysis showing that transferring servicing to a third party would result in dramatically reduced, if not completely eliminated, recoveries to junior creditors – and the potential for a catastrophic and total impairment of Silverleaf's collateral; and (ii) clear warnings of the

same from Silverleaf based upon its expertise and significant experience in the subprime lending space; and

c)  Refusing to provide financial reporting with respect to the liquidation process based on reasonable requests of Silverleaf, which failure has substantially impeded Silverleaf's ability to monitor the liquidation (and therefore, assess the value of its Collateral and the probability of a recovery from the proceeds of liquidation).

124.    CIBC's failure to provide, or to facilitate the provision of, financial reporting to Silverleaf is inexcusable, as CIBC knew or should have known that the requirement of providing such financial reporting was an express requirement of Turner, which requirement was thereafter imputed to Westlake, as an agent of Turner.

125.    As a direct and proximate result of CIBC's breach of the implied covenant of good faith and fair dealing, as of the date of this Complaint, Silverleaf is entitled to a money judgment in an amount not less any deficiency balance remaining on the Loan after the liquidation of its Collateral, plus Silverleaf's attorneys' fees and costs in an amount to be determined at trial.

WHEREFORE, Silverleaf respectfully requests that this Court enter judgment in its favor and against CIBC:

a)  awarding to Silverleaf an amount not less any deficiency balance remaining on the Loan after the liquidation of its Collateral, plus Silverleaf's attorneys' fees and costs in an amount to be determined at trial;

b)  such additional amounts allowable under the Intercreditor Agreement as they accrue; and

c)  granting such other and further relief in favor of Silverleaf as this Court deems fair and equitable.

**COUNT V**
**Fraud**
**Against CIBC**

126.  Silverleaf repeats and realleges the allegations contained in paragraphs 1 through 96 of the Complaint as if fully set forth herein.

127.  The CIBC Credit Agreement contemplated entry into a Backup Servicing Agreement having an expressly limited scope by no later than January 20, 2021.

128.  In fact, a Backup Servicing Agreement was not entered into until August 1, 2022 – one month before the Silverleaf Loans closed – and that agreement was far more expansive than contemplated in the CIBC Credit Agreement, effectively giving CIBC complete, unfettered control over the servicing of Turner's portfolio and allowing it to transition servicing for any reason – or no reason at all.

129.  Neither an executed nor a form Backup Servicing Agreement was provided to Silverleaf during its negotiations concerning the Turner Loans and the Intercreditor Agreement. In fact, the Center Street Backup Servicing Agreement was not provided to Silverleaf until July 2023 – almost a year after it had been entered into – and it was not even provided by CIBC, but rather, by Turner.

130.  Furthermore, a Successor Servicing Agreement was also entered into with Center Street, without the knowledge or consent of Silverleaf, and with no mention whatsoever in the CIBC Credit Agreement that such an agreement was required or contemplated. Silverleaf did

not see this agreement for the first time until a year after it was entered into, and long after Silverleaf funded its Loan to Turner.

131.    Had the true nature of the Backup Servicing Agreement been revealed to Silverleaf at the time it was negotiating the Turner Loans, it would have immediately exited the transaction, as such agreement would have presented an unacceptably high risk to the value and collectability of Silverleaf's collateral, and constituting commercial unreasonableness in the context of the niche area of subprime lending.

132.    CIBC knew, or should have known, that the disclosure of the true nature of the Backup Servicing Agreement would have acted as a substantial deterrent to Silverleaf providing substantial subordinated financing that provided necessary working capital to Turner, and in turn, protecting and preserving CIBC's collateral.

133.    This omission was material to Silverleaf agreeing to enter into the Loan Documents and the Intercreditor Agreement, and in funding the Loans.

134.    As a direct and proximate result of CIBC's fraudulent omission, Silverleaf is entitled to a money judgment in an amount not less any deficiency balance remaining on the Loan after the liquidation of its Collateral.

135.    In addition, Silverleaf is entitled to judgment against CIBC for actual, general, compensatory, incidental, special, consequential, and punitive damages, plus Silverleaf's attorneys' fees and costs, in an amount to be determined at trial.

**WHEREFORE,** Silverleaf respectfully requests that this Court enter judgment in its favor and against CIBC:

        a)    awarding to Silverleaf an amount not less any deficiency balance remaining on the Loan after the liquidation of its Collateral, plus

Silverleaf's attorneys' fees and costs in an amount to be determined at trial;

b)      awarding to Silverleaf its actual, general, compensatory, incidental, special, consequential, and punitive damages, in an amount to be determined at trial; and

c)      granting such other and further relief in favor of Silverleaf as this Court deems fair and equitable.

**COUNT VI**
**Failure to Act in a Commercially Reasonable Manner Pursuant to UCC Article 9**
**Against CIBC**

136.    Silverleaf repeats and realleges the allegations contained in paragraphs 1 through 96 of the Complaint as if fully set forth herein.

137.    Illinois law provides that: (a) after default, a secured party may dispose of "any or all of the collateral in its present condition or following any commercially reasonable preparation or processing" (801 ILCS 5/9-610(a)); and (b) "[e]very aspect of a disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable" (801 ILCS 5/9-610(b)).

138.    CIBC notified Turner of defaults under the CIBC Loan Documents by correspondence dated February 6, 2023, after which Turner ceased funding loan obligations in connection with its business, and began a process of managed self-liquidation.

139.    This thereby triggered CIBC's obligation under Illinois law to act in a commercially reasonable manner in the process of such liquidation.

140.    CIBC breached its obligation to dispose of the collateral in a commercially reasonable manner by, among other things:

31

a) The actions of CIBC more fully described in paragraph 39 of this Complaint;

b) Electing to utilize a third-party servicer to run Turner's liquidation rather than conducting a self-managed liquidation, notwithstanding (i) the High Ridge liquidation analysis showing that transferring servicing to a third party would result in materially lower recoveries and (ii) clear warnings of the same from Silverleaf based upon its expertise and significant experience in the subprime lending space; and

c) Refusing to provide financial reporting with respect to the liquidation process based on reasonable requests of Silverleaf, which failure has substantially impeded Silverleaf's ability to monitor the liquidation (and therefore, assess the value of its Collateral and the probability of a recovery from the proceeds of liquidation).

141. As a direct and proximate result of CIBC's breach of its obligation to dispose of the collateral in a commercially reasonable manner, Silverleaf is entitled to a money judgment in an amount not less any deficiency balance remaining on the Loan after the liquidation of its Collateral, plus Silverleaf's attorneys' fees and costs in an amount to be determined at trial.

**WHEREFORE,** Silverleaf respectfully requests that this Court enter judgment in its favor and against CIBC:

a) awarding to Silverleaf an amount not less any deficiency balance remaining on the Loan after the liquidation of its Collateral, plus Silverleaf's attorneys' fees and costs in an amount to be determined at trial;

b)     such additional amounts allowable under the Intercreditor Agreement as they accrue; and

c)     granting such other and further relief in favor of Silverleaf as this Court deems fair and equitable.

## COUNT VII
### Breach of Contract (Guaranty and Collateral Agreement)
### <u>Against Evolution</u>

142.    Silverleaf repeats and realleges the allegations contained in paragraphs 1 through 96 of the Complaint as if fully set forth herein.

143.    Silverleaf and Evolution are parties to the Guaranty and Collateral Agreement.

144.    The Guaranty and Collateral Agreement is a valid, binding, and enforceable contract between Silverleaf and Evolution.

145.    Silverleaf has performed all obligations and covenants on its part to be performed pursuant to the Guaranty and Collateral Agreement.

146.    Pursuant to the Guaranty and Collateral Agreement, Evolution unconditionally and absolutely guaranteed full payment and performance of all obligations under the Credit Agreement.

147.    Additionally, pursuant to the Guaranty and Collateral Agreement, Evolution agreed to pay all costs and legal expenses incurred by Silverleaf in attempting to collect the obligations.

148.    Evolution has defaulted on its obligations under the Guaranty and Collateral Agreement by failing to provide full payment of all obligations under the Credit Agreement.

149.    Further, Evolution has defaulted on its obligations under the Guaranty and Collateral Agreement by failing to perform Turner's obligations under the Credit Agreement,

including, but not limited to, the failure to provide required financial reporting under Article 10 thereunder.

150.    As a direct and proximate result of Evolution's breach of the Guaranty and Collateral Agreement, as of the date of this Complaint, Silverleaf is entitled to a money judgment in an amount not less than $7,017,083.33, consisting of $5,000,000 of unpaid principal and $2,017,083.33 of accrued and unpaid interest, plus additional accrued interest and Silverleaf's attorneys' fees and costs in an amount to be determined at trial.

WHEREFORE, Silverleaf respectfully requests that this Court enter judgment in its favor and against Evolution:

a)      awarding to Silverleaf an amount not less than $7,017,083.33, consisting of $5,000,000 of unpaid principal and $2,017,083.33 of accrued and unpaid interest, plus additional accrued interest and Silverleaf's attorneys' fees and costs in an amount to be determined at trial;

b)      such additional amounts allowable under the Guaranty and Collateral Agreement as they accrue; and

c)      granting such other and further relief in favor of Silverleaf as this Court deems fair and equitable.

## COUNT VIII
### Foreclosure of Security Interest
### Against Evolution

151.    Silverleaf repeats and realleges the allegations contained in paragraphs 1 through 96 of the Complaint as if fully set forth herein.

152.    Silverleaf and Evolution are parties to the Guaranty and Collateral Agreement.

153.    The Guaranty and Collateral Agreement is a valid, binding, and enforceable contract between Silverleaf and Evolution.

154.    Silverleaf has performed all obligations and covenants on its part to be performed pursuant to the Guaranty and Collateral Agreement.

155.    Evolution has defaulted on its obligations under the Guaranty and Collateral Agreement by failing to provide full payment of all obligations under the Credit Agreement.

156.    Pursuant to the Guaranty and Collateral Agreement, Evolution granted to Silverleaf a security interest in Evolution's assets as more fully described in the Guaranty and Collateral Agreement.

157.    The Guaranty and Collateral Agreement expressly provides as follows:

> Each Grantor [which includes Evolution] hereby assigns and transfers to Lender [Silverleaf], and hereby grants to Lender and (to the extent provided herein) its Affiliates, a continuing security interest in all of its Collateral, as collateral security for the prompt and complete payment and performance when due (whether at the stated maturity, by acceleration or otherwise) of the Company Obligations or the Guarantor Obligations, as the case may be.

*See* Ex. C, § 3.

158.    "Company Obligations" means all Obligations of the Company. *See* Ex. C, § 1.2.

159.    Based upon Turner's defaults under the Term Note as described above, Silverleaf is entitled to take such action as permitted under applicable law to foreclose on the Collateral granted to it by Evolution under the Guaranty and Collateral Agreement.

**WHEREFORE,** Silverleaf respectfully requests that this Court enter judgment in its favor and against Evolution:

>    a)    affirming that Silverleaf may enforce all of the rights and remedies available to it under the Guaranty and Collateral Agreement;

b) for foreclosure of the Collateral under the Guaranty and Collateral Agreement;

c) awarding Silverleaf's attorneys' fees and costs; and

d) granting such other and further relief in favor of Silverleaf as this Court deems fair and equitable.

**COUNT IX**
**Breach of Contract (Levin Guaranty)**
**Against Jonathon and Rachel**

160. Silverleaf repeats and realleges the allegations contained in paragraphs 1 through 96 of the Complaint as if fully set forth herein.

161. Silverleaf, Jonathon and Rachel are parties to the Levin Guaranty.

162. The Levin Guaranty is a valid, binding, and enforceable contract against Jonathon and Rachel.

163. Silverleaf has performed all obligations and covenants on its part to be performed pursuant to the Levin Guaranty.

164. Pursuant to the Levin Guaranty, Jonathon and Rachel each jointly and severally agreed to unconditionally and absolutely guarantee full payment of all obligations under the Term Note.

165. Additionally, pursuant to the Levin Guaranty, Jonathon and Rachel agreed to pay all costs and legal expenses incurred by Silverleaf in attempting to collect the obligations.

166. Jonathon and Rachel have defaulted on their obligations under the Levin Guaranty by failing to provide full payment of all obligations under the Term Note.

167. As a direct and proximate result of Jonathon's and Rachel's breach of the Levin Guaranty, as of the date of this Complaint, Silverleaf is entitled to a money judgment in an

amount not less than $7,017,083.33, consisting of $5,000,000 of unpaid principal and $2,017,083.33 of accrued and unpaid interest, plus additional accrued interest and Silverleaf's attorneys' fees and costs in an amount to be determined at trial.

WHEREFORE, Silverleaf respectfully requests that this Court enter judgment in its favor and against Jonathon and Rachel, jointly and severally:

      a)    awarding to Silverleaf an amount not less than $7,017,083.33, consisting of $5,000,000 of unpaid principal and $2,017,083.33 of accrued and unpaid interest, plus additional accrued interest and Silverleaf's attorneys' fees and costs in an amount to be determined at trial;

      b)    such additional amounts allowable under the Levin Guaranty as they accrue; and

      c)    granting such other and further relief in favor of Silverleaf as this Court deems fair and equitable.

## COUNT X
### Foreclosure of Security Interest
### <u>Against the Trust</u>

168.    Silverleaf repeats and realleges the allegations contained in paragraphs 1 through 96 of the Complaint as if fully set forth herein.

169.    Silverleaf and the Trust are parties to the Rachel Levin Pledge Agreement.

170.    The Rachel Levin Pledge Agreement is a valid, binding, and enforceable contract against the Trust.

171.    Silverleaf has performed all obligations and covenants on its part to be performed pursuant to the Rachel Levin Pledge Agreement.

172. The Trust has defaulted on its obligations under the Rachel Levin Pledge Agreement by failing to provide full payment of all obligations under the Credit Agreement.

173. Pursuant to the Rachel Levin Pledge Agreement, upon the occurrence of an Event of Default, Silverleaf is entitled under the Rachel Levin Pledge Agreement to take certain actions as its rights and remedies, including, among others, becoming "entitled to notify the Pledged Issuer of the Pledged Equity to make payment to Lender and to receive all Distributions to be applied toward the satisfaction of the Obligations and to exercise all voting, conversion, exchange, subscription or other corporate rights, privileges or options pertaining to the Pledged Equity[]" and having "the right, at its discretion, to transfer to or register in the name of Lender or any nominee of Lender any of the Collateral."

174. Silverleaf is entitled to enforce all of the rights and remedies available to it under the Rachel Levin Pledge Agreement and to foreclose on the Collateral.

**WHEREFORE,** Silverleaf respectfully requests that this Court enter judgment in its favor and against the Trust:

a) affirming that Silverleaf may enforce all of the rights and remedies available to it under the Rachel Levin Pledge Agreement;

b) for foreclosure of the Collateral under the Rachel Levin Pledge Agreement;

c) awarding Silverleaf's attorneys' fees and costs; and

d) granting such other and further relief in favor of Silverleaf as this Court deems fair and equitable.

## COUNT XI
### Foreclosure of Security Interest
### <u>Against Jonathan</u>

175.     Silverleaf repeats and realleges the allegations contained in paragraphs 1 through 96 of the Complaint as if fully set forth herein.

176.     Silverleaf and Jonathon are parties to the Jonathon Levin Pledge Agreement.

177.     The Jonathon Levin Pledge Agreement is a valid, binding, and enforceable contract against Jonathon.

178.     Silverleaf has performed all obligations and covenants on its part to be performed pursuant to the Jonathon Levin Pledge Agreement.

179.     Jonathon has defaulted on his obligations under the Jonathon Levin Pledge Agreement by failing to provide full payment of all obligations under the Credit Agreement.

180.     Pursuant to the Jonathon Levin Pledge Agreement, upon the occurrence of an Event of Default, Silverleaf is entitled under the Jonathon Levin Pledge Agreement to take certain actions as its rights and remedies, including, among others, becoming "entitled to notify the Pledged Issuer of the Pledged Equity to make payment to Lender and to receive all Distributions to be applied toward the satisfaction of the Obligations and to exercise all voting, conversion, exchange, subscription or other corporate rights, privileges or options pertaining to the Pledged Equity[]" and having "the right, at its discretion, to transfer to or register in the name of Lender or any nominee of Lender any of the Collateral."

181.     Silverleaf is entitled to enforce all of the rights and remedies available to it under the Jonathon Levin Pledge Agreement and to foreclose on the Collateral.

**WHEREFORE,** Silverleaf respectfully requests that this Court enter judgment in its favor and against Jonathon:

a)    affirming that Silverleaf may enforce all of the rights and remedies available to it under the Jonathon Levin Pledge Agreement;

b)    for foreclosure of the Collateral under the Jonathon Levin Pledge Agreement;

c)    awarding Silverleaf's attorneys' fees and costs; and

d)    granting such other and further relief in favor of Silverleaf as this Court deems fair and equitable.

### COUNT XII
### Foreclosure of Security Interest
### <u>Against Evolution</u>

182.    Silverleaf repeats and realleges the allegations contained in paragraphs 1 through 96 of the Complaint as if fully set forth herein.

183.    Silverleaf and Evolution are parties to the Evolution Pledge Agreement.

184.    The Evolution Pledge Agreement is a valid, binding, and enforceable contract against Evolution.

185.    Silverleaf has performed all obligations and covenants on its part to be performed pursuant to the Evolution Pledge Agreement.

186.    Evolution has defaulted on its obligations under the Evolution Pledge Agreement by failing to provide full payment of all obligations under the Credit Agreement.

187.    Pursuant to the Evolution Pledge Agreement, upon the occurrence of an Event of Default, Silverleaf is entitled under the Evolution Pledge Agreement to take certain actions as its rights and remedies, including, among others, becoming "entitled to notify the Pledged Issuer of the Pledged Equity to make payment to Lender and to receive all Distributions to be applied toward the satisfaction of the Obligations and to exercise all voting, conversion, exchange, subscription or other corporate rights, privileges or options pertaining to the Pledged Equity[]"

and having "the right, at its discretion, to transfer to or register in the name of Lender or any nominee of Lender any of the Collateral."

188.     Silverleaf is entitled to enforce all of the rights and remedies available to it under the Evolution Pledge Agreement and to foreclose on the Collateral.

**WHEREFORE,** Silverleaf respectfully requests that this Court enter judgment in its favor and against Evolution:

        a)     affirming that Silverleaf may enforce all of the rights and remedies available to it under the Evolution Pledge Agreement;

        b)     for foreclosure of the Collateral under the Evolution Pledge Agreement;

        c)     awarding Silverleaf's attorneys' fees and costs; and

        d)     granting such other and further relief in favor of Silverleaf as this Court deems fair and equitable.

## COUNT XIII
## Appointment of Receiver
## <u>Against Turner</u>

189.     Silverleaf repeats and realleges the allegations contained in paragraphs 1 through 96 of the Complaint as if fully set forth herein.

190.     Silverleaf and Turner entered into the Credit Agreement.

191.     The Credit Agreement is a valid, binding, and enforceable contract between Silverleaf and Turner.

192.     Silverleaf has performed all obligations and covenants on its part to be performed pursuant to the Credit Agreement.

193.    Events of Default have occurred and are continuing under the Credit Agreement, including that since March 3, 2023, Turner has failed to make interest payments to Silverleaf, and has never made a required payment of principal to Silverleaf.

194.    As a result of the Events of Default, Turner breached the Credit Agreement.

195.    In light of the occurrences of the Events of Default, Silverleaf has every right and remedy available to it in law and equity, including the right to appoint a receiver of Turner's business.

196.    Additional grounds exist to appoint a receiver in light of the actions taken by CIBC alleged in this Complaint, which have caused direct and potentially irreparable harm to Silverleaf's collateral position and have introduced substantial doubt as to whether Silverleaf will be repaid from the liquidation of Turner's loan portfolio.

197.    Silverleaf desires to exercise its right of possession by appointing a receiver.  A receiver is necessary to secure and preserve, and to maximize the value of, Turner's property, which has become necessary in light of CIBC's commercially unreasonable forced liquidation of Silverleaf's collateral and CIBC's complete refusal to provide or facilitate information necessary for Silverleaf to monitor its collateral.  The value of Turner's property is at risk of imminent dissipation because Turner is insolvent, has ceased typical business operations, and CIBC has elected unilaterally to utilize a third-party service to run the liquidation of Turner's business and property rather than to run a self-managed liquidation which process is deleterious in value and is causing material harm to Silverleaf.

**WHEREFORE,** Silverleaf respectfully requests that this Court enter judgment in its favor and against Turner:

a)   appointing a receiver to manage the property and business of Turner pending a trial on the merits as requested in Silverleaf's subsequently filed Emergency Motion for Appointment of a Receiver;

b)   awarding Silverleaf's attorneys' fees and costs; and

c)   granting such other and further relief in favor of Silverleaf as this Court deems fair and equitable.

Dated:  October 1, 2025                    Respectfully submitted,

**SILVERLEAF PRIVATE CREDIT, LLC**

By:____/s/ Thomas R. Fawkes_____
        One of Its Attorneys

Thomas R. Fawkes
Jason M. Torf
Daniel C. Curth
TUCKER ELLIS LLP
233 S. Wacker Dr., Suite 6950
Chicago, Illinois 60606
Phone:  312-256-9425
E-mail:  thomas.fawkes@tuckerellis.com
            jason.torf@tuckerellis.com
            daniel.curth@tuckerellis.com


and

A. Barry Cappello (*pro hac vice* to come)
Wendy D. Welkom (*pro hac vice* to come)
Cappello & Noël LLP
831 State Street
Santa Barbera, CA  93101
Phone:  805564-2444
E-mail:  abc@cappellonoel.com
            wwelcom@cappellonoel.com