**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| SILVERLEAF PRIVATE CREDIT, LLC,<br><br>        Plaintiff<br><br>        v.<br><br>TURNER ACCEPTANCE CORP., *et al.*,<br>        Defendants | No. 25 CV 11983<br><br>Judge Jeremy C. Daniel |

## MEMORANDUM OPINION AND ORDER

The heart of this matter is a contract dispute among lenders and a borrower. Defendant Turner Acceptance Corp. defaulted on its credit obligations, leading Defendant CIBC Bank USA to direct its self-managed liquidation. Plaintiff, Silverleaf Private Credit, LLC, believes that the liquidation is being handled in such a manner that it will not be able to recover on its junior loan. The plaintiff now seeks to recoup that loan amount and appoint a receiver to prevent further losses. The defendants move to dismiss and to strike the plaintiff's jury demand. For the reasons stated in this order, the motions to dismiss and to strike the jury demand are granted in part and denied in part, and the motion to appoint a receiver is denied.

## BACKGROUND

The following facts are taken from the complaint and assumed true for purposes of resolving the present motions. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In 2022, Plaintiff Silverleaf Private Credit, LLC ("Silverleaf") and Defendant Turner Acceptance Corp. ("Turner") entered into a credit agreement under which Silverleaf

executed and delivered to Turner a Term Note with a $5 million principal amount. (R. 1 ¶¶ 13–15.)[1] Silverleaf and Turner also executed a Guaranty and Collateral Agreement, which "granted to Silverleaf security interests in certain Collateral, consisting of all current and future personal property of Turner." (*Id.* ¶ 16.) At the time Silverleaf made its loan to Turner, "Turner also had loans outstanding with a bank group led by Defendant CIBC Bank USA" ("CIBC"). (*Id.* ¶ 18.)

During the same time, Silverleaf and CIBC entered a Subordination and Intercreditor Agreement ("the Subordination Agreement"), attached to the complaint, (R. 1-8), under which Silverleaf agreed to subordinate its claims and liens against Turner to those of CIBC. (R. 1 ¶¶ 19–20.) Under the Subordination Agreement, "CIBC undertook certain obligations . . . [including] the obligation to conduct any foreclosure of its liens on the Collateral in a commercially reasonable manner." (*Id.* ¶ 20.) The Subordination Agreement also prohibited Silverleaf "from taking certain actions to impede, interfere, or restrict or restrain the exercise by members of the Bank Group of rights and remedies under the CIBC Loan Documents." (*Id.* ¶ 22.)

When negotiating with CIBC, Silverleaf received a copy of the agreement between Turner and CIBC ("CIBC Credit Agreement"). (*Id.* ¶ 29.) However, the CIBC Credit Agreement referenced a "Backup Servicing Agreement"—which Silverleaf did not receive—between CIBC, Turner, and a "Backup Servicer." (*Id.*) Silverleaf asserts that it "would not have entered into the [Subordination Agreement] without seeing a copy of the Backup Servic[ing] Agreement and approving it." (*Id.*) The CIBC Credit

---

[1] For ECF filings, the Court cites to the page number(s) in the document's ECF header unless citing to a particular paragraph or other page designation is more appropriate.

Agreement described the Backup Servicing Agreement "as limited only to 'backup servicing and verification services,'" which "led Silverleaf to believe that no Backup Servicer would have expansive servicing powers or right to become a successor servicer, nor that CIBC would be able to force a transition to a third-party servicer." (*Id.* ¶ 30.) CIBC and Turner also executed a Successor Servicing Agreement, which "similarly can be invoked for seemingly any reason." (*Id.* ¶ 32.) The CIBC Credit Agreement did not reference the Successor Servicing Agreement at all. (*Id.*)

In February 2023, CIBC notified Turner that it was in default under the CIBC Credit Agreement.[2] (*Id.* ¶ 38.) This triggered a process where Turner underwent a "managed self-liquidation." (*Id.*) According to Silverleaf, CIBC failed to meet its obligation to manage Turner's liquidation in a commercially reasonable manner in several respects; namely, "CIBC restricted Turner's ability to allow its consumer borrowers to modify their loans" and "rejected a proposed refinancing transaction which would have cured Turner's over-advance on the Bank Group Loans." (*Id.* ¶ 39.) Silverleaf also retained High Ridge Partners, a turnaround advisory and consulting firm, which opined that a "Turner-managed self-liquidation" would provide "the best overall outcome for all stakeholders," but that transferring servicing to a third party would likely impair collateral and risk junior creditors' payouts. (*Id.* ¶¶ 40–43.) Despite Silverleaf conveying this information to CIBC, CIBC retained a third party to service Turner's portfolio. (*See id.* ¶¶ 40–50.) According to Silverleaf, this caused delinquency rates for delinquencies of thirty-one days or more to increase from 8.12%

---

[2] Since this same time, Turner has also been in default with respect to its loan from Silverleaf. (R. 1 ¶¶ 67–71.)

3

to 14.48%—a nearly 80% increase—between 2022 and 2023. (*Id.* ¶ 53.) Silverleaf projects that it may not recover anything from Turner's liquidation and that even CIBC may not fully recover. (*Id.* ¶ 56.)

Silverleaf filed this action against Turner, CIBC, and others not relevant to the present motions, seeking damages. Against CIBC, Silverleaf claims breach of contract (Counts III), breach of the implied covenant of good faith and fair dealing (Count II), fraud (Count V), and failure to act in a commercially reasonable manner (Count VI). (*Id.* ¶¶ 111–41.) Against Turner, it claims breach of contract (Count I) and specific performance (Count II). (*Id.* ¶¶ 97–110.) CIBC and Turner both move to dismiss the claims against them under Fed. R. Civ. P. 12(b)(1) (lack of subject-matter jurisdiction) and 12(b)(6) (failure to state a claim). They also move under Rule 12(f) to strike Silverleaf's jury demand. Separately, Silverleaf moves to appoint a receiver.[3] (R. 32.)

## LEGAL STANDARDS

Where, as here, the defendant raises a facial challenge to the Court's subject-matter jurisdiction under Rule 12(b)(1), the defendant "contend[s] that Plaintiffs' complaint lacks sufficient factual allegations to establish [jurisdiction]." *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015). To determine whether a complaint sufficiently pleads facts establishing the Court's jurisdiction, "courts apply the same analysis used to review whether a complaint adequately states a claim." *Id.*

---

[3] According to the complaint, Silverleaf's members are citizens of California, all defendants are citizens of Illinois, and the amount in controversy is at least $75,000. (R. 1 ¶¶ 1–7, 104.) Jurisdiction is therefore proper under 28 U.S.C. 1332(a).

"[A] motion to dismiss for failure to state a claim tests the sufficiency of the complaint . . . ." *McReynolds v. Merrill Lynch & Co., Inc.*, 694 F.3d 873, 879 n.4 (7th Cir. 2012). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Court "constru[es] the complaint in the light most favorable to the plaintiffs, accepting as true all well-pleaded facts, and drawing reasonable inferences in the plaintiffs' favor." *McReynolds*, 694 F.3d at 879. However, "to the extent that the terms of an attached contract conflict with the allegations of the complaint, the contract controls." *Centers v. Centennial Mortg., Inc.*, 398 F.3d 930, 933 (7th Cir. 2005).

Whether to appoint a receiver is left to the Court's discretion. *Connolly v. Gishwiller*, 162 F.2d 428, 435 (7th Cir. 1947).

## ANALYSIS

The Court addresses the claims against CIBC, the claims against Turner, the motions to strike Silverleaf's jury demand, and Silverleaf's motion to appoint a receiver, in that order.

### I. CLAIMS AGAINST CIBC (COUNTS III–VI)

#### A.    Standing & Ripeness

The Court first evaluates CIBC's standing and ripeness arguments because they speak to the Court's jurisdiction. *See Ortiz v. Fibrebaord Corp.*, 527 U.S. 815, 830–31 (1999); *Cent. States, Se. & Sw. Areas Health & Welfare Fund v. Am. Int'l Grp., Inc.*, 840 F.3d 448, 451 n.2 (7th Cir. 2016).

5

A plaintiff must establish standing by showing that it has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). CIBC argues Silverleaf has not alleged an injury in fact. (R. 39 at 21–25.) An injury in fact must be "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (citation modified). CIBC focuses on this second requirement, arguing that Silverleaf's "own allegations establish that its purported injuries and damages are speculative, conjectural, and contingent on future events that may or may not occur." (R. 39 at 25.) It further argues that Silverleaf cannot rely on future harm to establish standing because Silverleaf is seeking monetary damages, not prospective relief. (R. 67 at 2 (citing *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021)).)

The Court reads the complaint differently. The complaint does not allege purely contingent or speculative harm. Rather, it alleges ongoing harm to Silverleaf's interests, which includes harms that already occurred. The complaint states the CIBC's alleged violations of its obligations under the various agreements are "causing Silverleaf to suffer ongoing and continuing damages that are likely irreparable due to its position as a junior secured creditor." (R. 1 ¶ 34.) This is because CIBC's actions allegedly "resulted in a profound increase in delinquencies, and catastrophic portfolio losses, exactly as predicted by Silverleaf." (*Id.* ¶ 52.) The complaint alleges, more specifically, that delinquencies of greater than a month increased by 80% between

2022 and 2023 due to CIBC's actions. (*Id.* ¶ 53.) Based on this and other information Silverleaf received, it "has estimated that it may not recover *anything* on its substantial loans to Turner." (*Id.* ¶ 56.) Stated differently, Silverleaf has a legally protected interest in Turner's assets, and CIBC has caused the value of those assets to decrease, which is both a past and ongoing injury. *See, e.g., Kathrein v. City of Evanston*, 636 F.3d 906, 915 (7th Cir. 2011) ("[A] demonstrable reduction in property value . . . is sufficiently concrete and particularized to constitute an 'injury in fact.'"). The Court therefore rejects CIBC's standing argument.

For similar reasons, CIBC argues that Silverleaf's claims against it are not ripe. (R. 39 at 23–25.) A claim is not ripe for resolution "when the parties point only to hypothetical, speculative, or illusory disputes as opposed to actual, concrete conflicts." *Mathis v. Metro. Life Ins. Co.*, 12 F.4th 658, 664 (7th Cir. 2021) (quoting *Wis. Cent., Ltd. v. Shannon*, 539 F.3d 751, 759 (7th Cir. 2008)). "Put another way, a case is ripe if it is 'not dependent on "contingent future events that may not occur as anticipated, or indeed may not occur at all."'" *Wikstrom v. Air Line Pilots Ass'n, Int'l*, 156 F.4th 835, 840 (7th Cir. 2025) (quoting *Trump v. New York*, 592 U.S. 125, 131 (2020)).

The parties' ripeness arguments are not well-developed or meaningfully distinct from their standing arguments. *See Harrington v. Duszak*, 971 F.3d 739, 741 (7th Cir. 2020) ("Undeveloped arguments are waived without proper support."). Regardless, the complaint alleges some past harm, and this is enough to say the

7

dispute is not "hypothetical, speculative, or illusory." *Mathis*, 12 F.4th at 664. The Court therefore rejects CIBC's ripeness argument as well.

### B.    Count III

CIBC argues that for Count III, Silverleaf's breach of contract claim, the complaint does not plausibly allege a breach. (R. 39 at 25–26.) The complaint alleges that "[t]he [Subordination Agreement] obligates CIBC to act in a commercially reasonable manner in conducting and enforcing collateral lien foreclosures," and that CIBC breached by acting in a commercially unreasonable manner. (R. 1 ¶¶ 36–39 (citing R. 1-8 § 4.3).) According to CIBC, its obligation to act in a commercially reasonable manner never kicked in because it never enforced any collateral lien foreclosures; rather, as the complaint alleges, the process taking place is a "managed self-liquidation," not a legal proceeding for foreclosure. (R. 39 at 26 (emphasis omitted).) Silverleaf counters that this is based on an overly narrow interpretation of the term "foreclosure," and that the term accurately describes the present circumstances. (R. 64 at 10–12.)

This issue turns on an interpretation of the Subordination Agreement, which is a question of law. *See Deutsche Bank Nat'l Tr. Co. ex rel. First Franklin Mortg. Loan Tr. 2005-FF8 v. Roongseang*, 147 N.E.3d 864, 870–71 (Ill. App. Ct. 2019). Section 4.3 states,

> In foreclosing their Liens on the Collateral, so long as [CBIC] proceed[s] in a commercially reasonable manner, [CIBC] may proceed to foreclose on [its] Liens on the Collateral in any manner which [it] choose[s], even though a higher price might have been realized if [it] had proceeded to foreclose on [its] Liens in another manner.

(R. 1-8 § 4.3.) The Subordination Agreement does not define "foreclose." (*See id.* § 1.1.) "[A]n undefined term in a contract will be given its plain and ordinary meaning, which is found in its standard dictionary definition." *Laport v. MB Fin. Bank, N.A.*, 983 N.E.2d 1055, 1059 (Ill. App. Ct. 2012).

CIBC relies on the *Black's Law Dictionary* definition of "foreclosure": "legal proceeding to terminate a mortgagor's interest in property, instituted by the lender (the mortgagee) either to gain title or to force a sale in order to satisfy the unpaid debt secured by the property." (R. 39 at 26 (quoting *Foreclosure, Black's Law Dictionary* (12th ed. 2024)).) Similarly, the *Merriam-Webster Dictionary* defines "foreclosure" as "a legal proceeding that bars or extinguishes a mortgagor's right of redeeming a mortgaged estate," *Foreclosure, Merriam-Webster Dictionary* (12 ed. 2025), and the *Oxford English Dictionary* defines it as, "The action of foreclosing (a mortgage) or depriving (a mortgagor) of the power of redeeming a mortgaged estate; a proceeding to bar the right of redeeming mortgaged property," *Foreclosure, Oxford English Dictionary* (3d ed. 2025). These definitions describe a foreclosure as a legal proceeding that formally terminates a property interest.

The Subordination Agreement also appears to recognize a distinction between a formal foreclosure and other collection methods. It contains the defined term, "Enforcement Action," which "means any enforcement by any Secured Lender of any right or remedy including any *enforcement or foreclosure* of Liens securing any of its Secured Indebtedness *or any other efforts to collect* Proceeds from the Borrower's or any Guarantor's assets or properties to satisfy its Secured Indebtedness." (R. 1-8 §

9

1.1 (emphasis added).) This describes a "foreclosure" as just one kind of "Enforcement Action" a lender might take, and it shows that the Subordination Agreement uses the term "foreclosure" to mean something narrower than any effort to liquidate a borrower's assets. The broader definition would be more accurately captured by the defined term "Insolvency Proceeding," which includes "any voluntary or involuntary dissolution, winding-up, total or partial liquidation, reorganization or bankruptcy, insolvency, receivership or other statutory or common law proceedings or arrangements." (*Id.*)

The complaint does not allege that CIBC is participating in a legal proceeding to terminate Turner's interest in any property. Rather, it alleges "a self-managed liquidation." (R. 1 ¶ 115; *see also id.* ¶ 38.) Because of this, the obligation to act "in a commercially reasonable manner" under § 4.3 does not attach, and Count III fails to state a claim for breach of contract. Count III is dismissed.

### C. Count IV

Count IV is Silverleaf's claim for breach of the implied covenant of good faith and fair dealing. (R. 1 ¶¶ 118–25.) There is no independent cause of action under Illinois law for breach of the implied covenant of good faith and fair dealing; rather, it is an implication contained within every contract. *Flores v. Aon Corp.*, 242 N.E.3d 340, 355 (Ill. App. Ct. 2023). It "is essentially used as a construction aid in determining the intent of the parties where an instrument is susceptible of two conflicting constructions." *Bernacchi v. First Chi. Ins. Co.*, 52 F.4th 324, 330 (7th Cir. 2022) (quoting *Fox v. Heimann*, 872 N.E.2d 126, 134 (Ill. App. Ct. 2007)). "In other words, 'where an instrument is susceptible of two conflicting constructions, one which

10

imputes bad faith to one of the parties and the other does not,' the implied covenant of good faith and fair dealing indicates that 'the latter construction should be adopted.'" *Id.* (quoting *Mid-W. Energy Consultants, Inc. v. Covenant Home, Inc.*, 815 N.E.2d 911, 914 (Ill. App. Ct. 2004)).

Additionally, "[w]here a contract specifically vests one of the parties with broad discretion in performing a term of the contract, the covenant . . . requires that the discretion be exercised 'reasonably and with proper motive, not arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties.'" *Mid-W. Energy Consultants, Inc.*, 815 N.E.2d at 916 (quoting *Resol. Tr. Corp. v. Holtzman*, 618 N.E.2d 418, 424 (Ill. App. Ct. 1993)). In line with these principles, the "covenant does not . . . create an independent cause of action or an additional source of duties for the parties to the contract." *See Siegal v. GEICO Cas. Co.*, 523 F. Supp. 3d 1032, 1038–39 (N.D. Ill. 2021) (citing *Beraha v. Baxter Health Care Corp.*, 956 F.2d 1436, 1443 (7th Cir. 1992)).

CIBC argues for dismissal because the complaint "does not allege any facts or identify any provision of the Subordination Agreement giving CIBC discretion to perform the acts that allegedly violated the implied covenant." (R. 39 at 28.) Silverleaf responds that Count IV relates to "CIBC's discretionary administration and liquidation of its (and Silverleaf's) collateral" pursuant to § 4.3 of the Subordination Agreement. (R. 64 at 12–14.) This is the same provision Silverleaf alleges in Count III that CIBC breached. As discussed above, § 4.3 does not apply because there is no foreclosure. This means that CIBC has not exercised any discretionary right created

11

by § 4.3. Silverleaf's implied covenant claim is therefore not tethered to any provision of the Subordination Agreement, so the Court dismisses Count IV.

### D.    Count V

Count V is a fraud claim based on CIBC's failure to fully inform Silverleaf about the Backup Servicing Agreement and the Successor Servicing Agreement. (R. 1 ¶¶ 126–35.) A common law fraud claim must allege the following: "(1) a false statement of material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that the statement induce the plaintiff to act; (4) plaintiff's reliance upon the truth of the statement; and (5) plaintiff's damages resulting from reliance on the statement." *Connick v. Suzuki Motor Co., Ltd.*, 675 N.E.2d 584, 591 (Ill. 1996). Where the plaintiff alleges a fraudulent concealment, as Silverleaf does here, "a plaintiff must allege that the defendant concealed a material fact when he was under a duty to disclose that fact to [the] plaintiff." *Moore v. Pendavinji*, 260 N.E.3d 111, 120 (Ill. App. Ct. 2024) (quoting *Connick*, 675 N.E.2d at 593). "Where . . . there is no fiduciary relationship between the parties, a duty to disclose may arise under Illinois law if the defendant makes an affirmative statement that it passes off as the whole truth while omitting material facts that render the statement a misleading 'half-truth.'" *Crichton v. Golden Rule Ins. Co.*, 576 F.3d 392, 397–98 (7th Cir. 2009) (citation omitted). Additionally, as a fraud allegation, this claim is subject to Rule 9(b)'s heightened pleading standard. "That rule requires plaintiffs to plead with particularity the 'who, what, when, where, and how' of the fraud." *Appvion, Inc. v. Ret. Sav. & Emp. Stock Ownership Plan v. Buth*, 99 F.4th 928, 944 (7th Cir. 2024).

12

CIBC argues that Count V should be dismissed because "Silverleaf has not alleged that CIBC told a half-truth,"[4] and because the complaint "fails to plausibly allege a claim for fraud with particularity under Rule 9(b)." (R. 39 at 31–32.)

According to the complaint, during Silverleaf's negotiations with CIBC, Silverleaf "was provided with a copy of the [CIBC Credit Agreement]," which "makes reference to a 'Backup Servicing Agreement' between Turner, CIBC, and a 'Backup Servicer.'" (R. 1 ¶¶ 28–29.) The CIBC Credit Agreement described the Backup Servicing Agreement "as limited only to 'backup servicing and verification services.'" (*Id.* ¶ 30.) According to Silverleaf, this statement in the CIBC Credit Agreement was a half-truth because it "led Silverleaf to believe that no Backup Servicer would have expansive servicing powers or right[s] to become a successor servicer, nor that CIBC would be able to force a transition to a third-party servicer for any conceivable reason." (*Id.*; R. 64 at 14.) The complaint also alleges that "[t]he CIBC Credit Agreement contemplated entry into a Backup Servicing Agreement . . . no later than January 20, 2021," but it "was not entered into until August 1, 2022—one month before the Silverleaf Loans closed." (R. 1 ¶¶ 127–28.) Finally, it alleges that "a Successor Servicing Agreement was also entered into . . . without the knowledge or consent of Silverleaf, and with no mention whatsoever in the CIBC Credit Agreement that such an agreement was required or contemplated." (*Id.* ¶ 130.)

---

[4] CIBC also argues that it owed no duty to Silverleaf because "Silverleaf has not alleged facts suggesting a special or fiduciary relationship between it and CIBC," (R. 39 at 30), but Silverleaf does not defend against this argument and instead relies on the theory that CIBC told a half-truth, (*see* R. 64 at 14–17).

13

There are several issues with these allegations. First, the complaint's fraud allegations omit the "who" with regard to the alleged misleading half-truth: it states passively that "[Silverleaf] was provided with a copy of the [CIBC Credit Agreement]." (*Id.* ¶ 28.) There is no particular allegation of who made the statement. *See Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 446 F. Supp. 2d 163, 186 n.153 (S.D.N.Y. 2006) ("Plaintiffs must allege the speaker of a misrepresentation with particularity and may not obscure pleading deficiencies by casting allegations in the passive voice."). Second, the complaint incorrectly states that "[t]he CIBC Credit Agreement descri[bes] . . . the Backup Servicing Agreement *as limited only to* 'backup servicing and verification services'" (R. 1 ¶ 30 (emphasis added)); in fact, the CIBC Credit Agreement states, "such backup servicing agreement . . . *among other things*, shall provide for the Backup Servicer to perform backup servicing and verification services as described therein." (R. 1-9 at 12 (emphasis added).) Third, neither the complaint nor Silverleaf's brief explains why the statement about the contemplated entry date was material. (*See, e.g.*, R. 1 ¶¶ 31, 128; R. 64 at 14–17.) And finally, there is no allegation of any half-truth that deceived Silverleaf regarding the existence of the Successor Servicing Agreement. (*See* R. 1 ¶¶ 28–33, 126–35; R. 64 at 14–17.)

In sum, the complaint does not sufficiently allege that CIBC owed Silverleaf a duty to disclose based on any half-truth CIBC told Silverleaf. Because of this, Count V is dismissed.

14

### E. Count VI

Count VI is a claim under § 9-610 of the Illinois Uniform Commercial Code, which states, "After default, a secured party may sell, lease, license, or otherwise dispose of any or all of the collateral in its present condition or following any commercially reasonable preparation or processing." 810 ILCS 5/9-610(a). It continues, "Every aspect of a disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable." *Id.* § 5/9-610(b). CIBC argues that "Silverleaf does not allege that CIBC sold, leased, licensed, or otherwise disposed of any Collateral," so the "commercially reasonable" requirement does not apply. (R. 39 at 32.) Silverleaf's response is that it alleges CIBC "seized control over and transferred servicing of the loan portfolio to [a] third-party . . . that continues to administer the loans," which is sufficient to demonstrate disposition of the collateral. (R. 64 at 17 (citing R. 1 ¶ 50).)

Whether Silverleaf already disposed of any collateral is irrelevant. The "commercially reasonable" requirement applies to "[e]very aspect of a disposition," including "preparation or processing." § 5/9-610(a)–(b). The complaint alleges that CIBC is directing the management of Turner's loan portfolio to eventually liquidate it. (*See, e.g.*, R. 1 ¶¶ 40, 57.) The statute therefore requires CIBC to act in a commercially reasonable manner. The Court rejects CIBC's argument for dismissal, and its motion is denied as to Count VI.

## II. CLAIMS AGAINST TURNER (COUNTS I & XIII)

Turner moves to dismiss both Counts I (breach of contract) and XIII (appointment of receiver) because it contends that Silverleaf waived its right to assert

15

these claims in the Subordination Agreement. (R. 50 at 10–12.) Silverleaf counters that the Subordination Agreement's "No Third Party Beneficiaries" provision bars Turner from asserting Silverleaf's waiver as a defense. (R. 66 at 5–6.) The Court agrees with Silverleaf.

Under § 6.16 of the Subordination Agreement, the agreement "is solely for the benefit of the Secured Lenders and their respective successors and assigns . . . , and none of the Borrower, the Parent, any Guarantor or any other Person is intended to be a third party beneficiary hereunder or . . . to have any right to enforce[] this Agreement." (R. 1-8 § 6.16.) The Subordination Agreement defines "Borrower" as Turner, (*id.* § 1.1), and Turner is attempting to enforce the Subordination Agreement's waiver provision. The Subordination Agreement expressly prohibits this.

Turner makes several arguments to avoid this result. First, it argues this result is "absurd" because it "ignores the very purpose of the Subordination Agreement such that Silverleaf may bypass express restrictions on Silverleaf's rights to enforce its loan documents." (R. 71 at 5.) However, this ignores other ways to enforce the provision, such as a senior creditor intervening in a lawsuit that would constitute a breach of a subordination agreement. *See, e.g.*, *Bowling Green Sports Ctr., Inc. v. G.A.G. LLC*, 77 N.E.3d 728, 730 (Ill. App. Ct. 2017) ("[The senior lender] intervened in the proceedings and sought to have [the junior lender's] complaint dismissed on the basis of the intercreditor agreement."). Silverleaf's interpretation

16

thus does not leave the waivers without an enforcement mechanism, as Turner suggests.

Second, Turner argues that invoking the waiver provisions does not qualify as "enforcing" the Subordination Agreement within the meaning of § 6.16. (R. 71 at 5–7.) According to Turner, it is instead "relying on the express terms of the Subordination Agreement to *defend* against Silverleaf's improper claims." (*Id.* at 5.) Turner cites the decision of another court in this circuit in *BKCAP, LLC v. Captec Franchise Trust 2000-1*, 701 F. Supp. 2d 1030 (N.D. Ind. 2010).[5] (R. 71 at 6–7.)

In *BKCAP, LLC*, the court addressed whether a lender is "enforcing its rights when defending against allegations that *it* breached a loan agreement." 701 F. Supp. 2d at 1037. The court concluded it does not, reasoning that, "[i]n the legal context . . . , 'enforce' involves more than mere participation in a dispute. Rather, it plainly contemplates an offensive, coercive act—such as filing a lawsuit after a default—to compel observance or obedience." *Id.* The court reasoned that, because the plaintiff contended that the defendant did not act according to the contract's terms, and the defendant argued that it actually did, the defendant was not seeking to remedy any disobedience with the contract, so it was not acting to "enforce" the contract. *See id.* at 1038. Turner takes this to mean that "enforcement" only includes "offensive" actions. (R. 71 at 6.) But this overreads the court's conclusion. The key factor was

---

[5] Turner also relies on the Subordination Agreement's definition of "Enforcement Action," which contemplates only offensive actions by Secured Lenders, for example, foreclosure liens, collection efforts, or involuntary bankruptcies. (R. 71 at 6–6 (citing R. 1-8 § 1.1).) This argument is unpersuasive. "Enforcement Action" is a defined term, and § 6.16 did not use that term despite it being an available option.

17

whether the party in question was seeking to compel obedience following an "act of disobedience," not whether one party happened to be the plaintiff. *See BKCAP, LLC*, 701 F. Supp. 2d at 1037–38. As the Seventh Circuit confirmed on appeal, "enforcement requires some element of contractual noncompliance." *BKCAP, LLC V. CAPTEC Franchise Tr. 2000-1*, 688 F.3d 810, 815 (7th Cir. 2012). Here, Turner is arguing that Silverleaf's bringing Counts I and XIII is itself a failure to comply with the Subordination Agreement, and Turner is seeking to compel compliance. That is an attempt to "enforce" the Subordination Agreement.

Finally, Turner argues that § 6.16 is ambiguous because "it limits the rights of third parties *and* parties in a single sentence without providing any clarity as to why Turner is a party to the Subordination Agreement while being stripped of any rights thereunder and included [in] a list of entities not intended to be third-party beneficiaries." (R. 71 at 8.) This reading, to Turner, renders the language ambiguous because it "strains credulity." (*Id.*) The Court disagrees and finds the language perfectly clear. Section 6.16 states, "none of the Borrower, [or other enumerated parties] is intended to be a third party beneficiary . . . or to have any right to enforce[] this Agreement." (R. 1-8 § 6.16.) "Borrower" is defined as Turner. (*Id.* § 1.1.) This language unambiguously means that Turner has no right to enforce the Subordination Agreement, and Turner has not identified any other possible interpretation that would render it ambiguous. *See Eakins v. Hanna Cylinders, LLC*, 42 N.E.3d 858, 861 (Ill. App. Ct. 2015) ("A contract is ambiguous if it is susceptible to more than one meaning.").

18

Because Turner's arguments are based on waivers in the Subordination Agreement, and the agreement clearly states that Turner has no right to enforce it, Turner's motion to dismiss is denied.

## III. JURY DEMAND

Both CIBC and Turner move to strike Silverleaf's jury demand. CIBC moves to strike the demand as to Counts III–VI, and Turner moves as to Counts I, II, and XIII. (R. 39 at 33–34; R. 50 at 13–14.) They both argue that Silverleaf waived its right to a jury trial under § 6.15(b) of the Subordination Agreement. Silverleaf's response is that CIBC's breach and fraudulent conduct rendered the waiver unenforceable, (R. 64 at 19–20; R. 66 at 11–12), and that Turner has no right under the Subordination Agreement to enforce this provision, (R. 66 at 12).

Silverleaf's breach of contract and fraud claims against CIBC are dismissed; this undermines Silverleaf's argument for not enforcing the waiver. CIBC's motion to strike the jury demand is therefore granted as to Counts III–VI. As to Turner, however, the waiver is contained within the Subordination Agreement. As discussed above, Turner has no right to enforce the agreement. Because of this, Turner's motion to strike the jury demand is denied.

## IV. RECEIVER

Last, the Court addresses Silverleaf's motion to appoint a receiver.[6] "Federal courts have an inherent equitable power to appoint a receiver to manage a

---

[6] Turner argues that the Court should strike Silverleaf's motion and accompanying memorandum of law for failing to comply with the page limits in Local Rule 7.1. (R. 55 at 15.) The Court declines to strike these materials, but Silverleaf is admonished that it must comply with all local rules. Failure to do so going forward may result in sanctions, including striking

defendant's assets during the pendency of litigation." *In re McGaughey*, 24 F.3d 904, 907 (7th Cir. 1994). "[T]he power to appoint a receiver is a drastic, harsh and dangerous one and should be exercised with care and caution." *Connolly*, 162 F.2d at 435. The Seventh Circuit has not established a specific framework for deciding whether to appoint a receiver, but courts in this circuit generally consider the following factors:

> 1) fraudulent conduct on the part of the defendant; 2) whether there is imminent danger of the property being lost, diminished in value or squandered; 3) the inadequacy of the available legal remedies; 4) the probability that harm to a plaintiff would be greater than the injury to the parties opposing appointment; and 5) the plaintiff's probable success in the action and the possibility of irreparable injury to their interest in the property.

*See PNC Bank, Nat'l Ass'n v. Mejia*, No. 12 C 6688, 2013 WL 169994, at *5 (N.D. Ill. Jan. 16, 2013) (citing *Consol. Rail Corp. v. Fore River Ry. Co.*, 861 F.2d 322, 326–37 (1st Cir. 1988)); *see also Dewey v. Bechthold*, No. 18 C 1739, 2019 WL 1129496, at *2 (E.D. Wis. Mar. 12, 2019); *Regions Bank v. R & D Dev. Corp.*, No. 10 C 759, 2011 WL 2149086, at *3 (S.D. Ill. May 31, 2011); *Miller v. Up in Smoke, Inc.*, No. 09 C 242, 2010 WL 5095812, at *3 (N.D. Ind. Dec. 8, 2010).

The first factor, fraudulent conduct by the defendant, weighs against Silverleaf. The Court dismissed Silverleaf's fraud claim, and the complaint contains no other allegations of fraud.

---

noncompliant filings. *See Teninty v. Geren*, 776 F. Supp. 2d 725, 729 (N.D. Ill. 2011) (quoted source omitted) ("Pleadings that do not conform with the local rules may be stricken at the discretion of the court.").

The second factor, imminent danger to the plaintiff's property, weighs in Silverleaf's favor. Silverleaf relies on data from 2022–24 that showed substantial increases in delinquencies, which Silverleaf projects will result in it receiving nothing from the liquidation. (R. 33 at 6; R. 60 at 6–12.) Turner's argument that this change was due to general market conditions is effectively countered by Silverleaf's pointing out that other lenders experienced much smaller increases. (R 55. at 9; R. 60 at 7–8.) The risk of harm is also still imminent seeing as the delinquency rates, though decreasing, have remained at double-digit levels. (*See* R. 57-1 at 9.)

The Court discusses the third factor, the inadequacy of legal remedies, and part of the fifth factor, whether the injury is irreparable, together. *See Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 545 (7th Cir. 2021) ("Harm is irreparable if legal remedies are inadequate to cure it."). These weigh against Silverleaf. Silverleaf's claimed harm is "irreparable injury to the value of its collateral if the current situation continues." (R. 60 at 5.) Silverleaf never mentions what this collateral specifically is, but it discusses the risk to collateral as the possibility that "junior creditors and shareholders would end up 'out of money'" at the end of the liquidation. (R. 1 ¶ 42.) Indeed, Silverleaf's requested relief is "a money judgment in an amount not less any deficiency balance remaining on the Loan after the liquidation of its Collateral." (*See, e.g.*, R. 1 ¶ 134.) Though Silverleaf argues that money damages would be inadequate because Turner will likely be insolvent and unable to pay any judgment, (R. 60 at 11–12), it may instead be made whole by a judgment against CIBC or any other co-defendant.

The fourth factor, the balance of harms, weighs against Silverleaf. Silverleaf says it "envisions the receiver would supervise the actions of the servicer and ensure it effectively collects the loans in an efficient, cost-effective manner, while compiling and communicating real-time data concerning those efforts to all affected parties, including CIBC." (R. 60 at 13.) As explained above, any benefit to Silverleaf a receiver might provide is diminished by the ability to recoup money damages. A receiver is also not necessary for Silverleaf to obtain information about the loan servicing: that is the subject of the litigation and what discovery is for. Further, as discussed below, appointing a receiver would likely interfere with CIBC's rights under the Subordination Agreement.

And the remaining portion of the fifth factor, probability of success, also weighs against Silverleaf. The legal basis for appointing a receiver is dubious at best. Under the Subordination Agreement, "after the occurrence of a Payment Default" or "receipt of a Payment Blockage Notice by Silverleaf," "Silverleaf will have no right to . . . institute or attempt to institute any Insolvency Proceedings against [Turner]." (R. 1-8 § 3.2(c).) "Insolvency Proceeding" includes "any voluntary or involuntary . . . receivership." (*Id.* § 1.1.) This at least puts Silverleaf's ability to receive this requested relief in substantial doubt.

All but one of these factors weigh against appointing a receiver. Particularly given the likelihood that Silverleaf waived its ability to seek appointment of a receiver, the Court concludes this is not the kind of circumstance that calls for such drastic relief.

22

## CONCLUSION

CIBC Bank USA's motion to dismiss and to strike jury demand [39] is granted in part and denied in part. The motion to dismiss is granted as to Counts III–V, it is denied as to Count VI, and the motion to strike jury demand is granted. Turner Acceptance Corp.'s motion to dismiss and to strike jury demand [50] is denied. The plaintiff's motion to appoint receiver [32] is denied. The defendants shall answer the remaining claims on or before May 15, 2026. The May 14, 2026, status hearing is stricken.

Date: April 23, 2026

_____
JEREMY C. DANIEL
United States District Judge